

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
10/05/2007

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO. 06-33618** |
| | § | **CHAPTER 7** |
| **KEVIN PRESTO,** | § | |
| **DEBTOR** | § | |

**MEMORANDUM OPINION ON OFFICIAL EMPLOYMENT-RELATED ISSUES**
**COMMITTEE OF ENRON CORP.'S OBJECTIONS TO DEBTOR'S CLAIM OF THE**
**HOMESTEAD EXEMPTION**
[Docket Nos. 25 and 107]

## I.      Introduction

Kevin Presto (the Debtor) was a vice-president at Enron North America Corporation prior

to the monumental collapse and eventual bankruptcy of its parent company, Enron Corporation

(Enron).[1]  Several weeks before Enron filed its Chapter 11 case, the Debtor was among a number of

Enron insiders who received lucrative bonus payments.[2]  The Debtor's bonus was $2 million.

On December 2, 2001, Enron filed its Chapter 11 petition in the Southern District of New

York, case no. 01-16034.  The Official Employment-Related Issues Committee of Enron Corp. (the

Committee) was created in the Enron bankruptcy case and assigned the right to prosecute avoidance

actions against the recipients of these bonus payments.  On December 9, 2005, the bonus payments

---

[1] The long and tortured tale of Enron has been well-documented in many sources. *See, e.g.*, BETHANY MCLEAN & PETER ELKIND, THE SMARTEST GUYS IN THE ROOM: THE AMAZING RISE AND SCANDALOUS FALL OF ENRON (2003); LYNN BREWER, HOUSE OF CARDS: CONFESSIONS OF AN ENRON EXECUTIVE (2002); KURT EICHENWELD, CONSPIRACY OF FOOLS (2005).  Enron's unraveling merely provided the catalyst for the events which gave rise to this dispute, and an in-depth analysis of specific details is not necessary.  For the purposes of this Memorandum Opinion, a cursory understanding of the events surrounding the final days of Enron, which the Court assumes on the part of the reader, is more than adequate.

[2] Enron's putative justification for these bonuses was the retention of key employees after a merger with Dynegy, Inc.—a merger which was never consummated.

were held to be fraudulent transfers, and a $2 million judgment was entered against the Debtor and in favor of the Committee (the Judgment).

During the four years it took for the Committee to obtain the Judgment, the Debtor spent or lost the entire $2 million bonus, which resulted in the filing of this Chapter 7 case on July 31, 2006.[3] Currently, the only significant asset remaining in the Debtor's estate is his homestead, which is worth over $500,000.00. On October 27, 2006, the Committee filed its Objection to Debtor's Claim of the Homestead Exemption [Docket No. 25], and subsequently the Committee filed its Supplemental Objection to Debtor's Claim of the Homestead Exemption [Docket No. 107] (collectively, the Objection).[4] The Objection presents three different objections under 11 U.S.C. § 522(o),(p), and (q), respectively[5]—all of which are new provisions added to the Code as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA).[6]  As the objecting party, the Committee bears the ultimate burden of establishing that the Debtor's claimed homestead exemption is improper. Fed. R. Bankr. P. 4003(c); *In re Hill*, 310 B.R. 294, 296 (Bankr. W.D. La. 2004).  The Committee must establish that the exemption is improper by a preponderance of the evidence. *In re Park*, 246 B.R. 837, 840 (Bankr. E.D. Tex. 2000).

---

[3] Ironically, the Debtor sustained substantial losses as a result of ill-chosen investments in the energy industry—the same business as his former employer, Enron North America.

[4] Unless otherwise noted, all references to docket numbers relate to the docket sheet in Case No. 06-33618.

[5] At the beginning of trial, the Objection actually included five different theories: the above referenced three, plus two alternative theories, one under § 522(o) and one under § 522(p).  The Court dismissed these latter two objections on the record in response to the Debtor's oral motion for judgment on partial findings pursuant to Fed. R. Civ. P. 52(c). Accordingly, these theories are outside of the scope of this Memorandum Opinion, but will be addressed briefly where relevant.

[6] Unless otherwise noted, all section references refer to 11 U.S.C. and all references to the "Code" or the "Bankruptcy Code" refer to the United States Bankruptcy Code.

Between April 4, 2007 and June 21, 2007, the Court held a total of eight hearings related to the Objection.[7] For the reasons set forth in this Memorandum Opinion, the Committee's Objection is sustained in part and overruled in part. A corresponding Order will be entered on the docket simultaneously with the entry of this Memorandum Opinion.

## II.      Jurisdiction and Venue

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. §§ 157(b)(2)(A), (B), and (O). This contested matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), and (O). Venue is proper pursuant to 28 U.S.C. §1408(1).

## III.     Standing[8]

The Debtor argues that the Committee lacks standing to file this Objection because it was merely assigned the right to prosecute and recover a judgment against the Debtor in the Enron bankruptcy case, but was never actually assigned the Judgment itself and therefore is not a creditor of the Debtor. The Court finds that the Committee has standing for two reasons: (1) the Debtor's argument misconstrues the requirements of standing to file an objection to exemption; and (2) the Debtor is estopped from denying that the Committee is the holder of the claim based on the Judgment.

First, the argument by Debtor's counsel implies that a party *only* has standing to file an objection to exemption if it is a creditor of the estate. While it is true that every creditor has standing

---

[7] Several of these hearings were dedicated to the cross motions for summary judgment filed by the Debtor and the Committee as well as a motion in limine filed by the Committee.

[8] The Debtor first challenged the standing of the Committee to file its Objection in his motion for summary judgment. [Docket No. 128.] In its order denying all motions for summary judgment, the Court determined that the Committee had standing. [Docket No. 151.] However, at the commencement of the hearing on the merits of the Objection, Debtor's counsel, wanting to avoid at all costs the risk of opposing counsel subsequently arguing that he had waived this legal issue on appeal, requested that he be allowed to argue this point again. The Court granted this request.

to object, it is incorrect to say that a party *must* be a creditor to object to a claimed exemption.

Bankruptcy Rule 4003(b) states that any "party in interest may file an objection" to a debtor's list

of exempt property. Although it is used several times throughout the Code, the phrase "party in

interest" is not a defined term. The Fifth Circuit has broadly interpreted "party in interest" to include

"any other person with a sufficient stake in [the] outcome of a proceeding so as to require

representation." *Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana*, 347 F.3d 589, 595

(5th Cir. 2003) (citing *In re Am. Appliance*, 272 B.R. 587 (Bankr. D. N.J. 2002)). The Judgment is

by far the Debtor's single largest unsecured debt, and the Committee is the eventual recipient of any

proceeds recovered from that claim through the terms of the Enron Plan. Thus, the Court finds that

the Committee is a party in interest and therefore has standing to file this Objection.[9]

---

[9] A brief summary of the origin and authority of the Committee may be helpful to understanding the Committee's status as a party-in-interest. On August 28, 2002, the court in the Enron bankruptcy case entered an Order of Final Approval Approving Settlement of Severance Claims of Similarly-Situated Claimants and Authorizing the Official Employment-Related Issues Committee to Commence Certain Avoidance Actions on Behalf of Estates (the Settlement Order). [Docket No. 128, Ex. 1.] The Settlement Order authorized the Committee to "prosecute, settle, and release" the Avoidance Actions. [Docket No. 128, Ex. 1, pg. 15.] The Settlement Order was later clarified by a subsequent order on May 12, 2003. This clarifying order states that the powers to "prosecute, settle, and release" which were granted to the Committee in the Settlement Order included the right to recover proceeds of the avoidance actions. [Docket No. 128, Ex. 4.]

The defendants in the avoidance actions (i.e. Presto and the other recipients of the bonus payments) challenged the validity of this Settlement Order and claimed that Enron improperly transferred the avoidance claims to the Committee. The court in the avoidance actions interpreted the Settlement Order as follows: "[T]he debtors and its [creditors'] committee agreed that the Employment Committee would prosecute certain avoidance actions as representative of the estates and for the benefit of the estates. However, they further agreed that the net proceeds, if any, from the avoidance litigation would be distributed to the settling employees in accordance with the terms of the settlement agreement. The agreement provides that the settling employees would be eligible to receive a *pro rata* distribution from any recovery from the avoidance litigation. The court's order entered August 28, 2002 recognized and approved the assignment of the net proceeds of the litigation to the settling employees." *Official Employment-Related Issues Comm. of Enron Corp. v. Lavorato (In re Enron Corp.)*, 319 B.R. 128, 133 (Bankr. S.D. Tex. 2004). The court in *Lavorato* then noted that such an assignment of litigation proceeds away from the estate to one creditor (i.e. the Committee) was inconsistent with § 550(a), which requires that the recovery become property of the estate. *Lavorato*, 319 B.R. at 133. Since the proceeds become part of the estate pursuant to § 550(a), the terms of the plan determine the specific distribution of any judgment proceeds. "The plan identifies a settlement fund trust governed by a trust agreement to be funded by any recovery from the avoidance claims and distributed to the settling employees as beneficiaries." *Lavorato*, 319 B.R. at 134. The court concluded that "the committee recovers a judgment for the benefit of the estate under § 550(a) and the plan, as confirmed by court order, directs its distribution. As a result, the committee may recover a judgment for the benefit of the estate under § 550(a)." *Lavorato*, 319 B.R. at 134.

Second, the Court finds that the Debtor is judicially estopped from denying that the claim

arising from the Judgment belongs to the Committee. *In re Sissom*, 366 B.R. 677, 697 (Bankr. S.D.

Tex. 2007) (citing *Larson v. Gross Bank, N.A.*, 204 B.R. 500, 501 (W.D. Tex. 1996); *Jacobson v.

Ornsby (In re Jacobson)*, No. 04-51572, 2006 U.S. Dist. LEXIS 70433, at *54 (W.D. Tex. Sept. 26,

2006)).  On March 28, 2007, the Committee filed a proof of claim against the Debtor's estate.

[Claim No. 5.]  The Debtor did not file an objection to the Committee's claim.  The Debtor filed a

Schedule F on three different occasions—the original Schedule F on July 31, 2006 [Docket No. 1,

p. 20], an amended Schedule F on October 13, 2006 [Docket No. 20], and a second amended

Schedule F on December 7, 2006. [Docket No. 59.]  In each of these three Schedules, the Debtor

listed the Committee as the name of the creditor holding the Judgment.  The Schedules do not try

to qualify the debt by indicating either that it is disputed or including such language as "on behalf

of Enron Corp."  Thus, the first time that the Debtor asserted that the debt was not owed to the

Committee was in his motion for summary judgment.  Accordingly, the Court finds that the Debtor

is judicially estopped from denying that the Committee holds a valid claim based on the Judgment.

## IV.    The Committee's Objection under 11 U.S.C. § 522(o)

### A.    Introduction

Shortly before filing his Chapter 7 petition, the Debtor sold his previous homestead and

purchased his current homestead.  Since the Debtor moved to a less expensive home, this transaction

---

This Court agrees with the *Lavorato* court's synthesis of the Settlement Order and the Enron Plan.  The Settlement Order authorized the Committee to prosecute the avoidance actions and recover judgments *on behalf of* the Enron estate.  Those funds would become part of the estate and then be distributed pursuant to the terms of the confirmed Chapter 11 Plan.  The Enron Plan creates a trust for the proceeds of the avoidance actions.  The members of the Committee are the beneficiaries of this trust.  The Debtor's argument against the Committee's standing is that this relationship, whereby the proceeds must pass through the Plan before reaching the Committee members, establishes standing only in the reorganized Enron as the true owner of the claim.  The Court disagrees.

left the Debtor with over $150,000.00 in cash.  The Committee's Objection under § 522(o) is premised on the theory that the Debtor intentionally spent these proceeds on improvements to his current homestead prior to filing bankruptcy in order to prevent the Committee from reaching these funds as a creditor in the impending bankruptcy.[10]

During the two-month period that hearings were held on the Committee's Objection, this Court issued a lengthy opinion regarding § 522(o).  *In re Sissom*, 366 B.R. 677 (Bankr. S.D. Tex. 2007).  On the record, the Court made counsel for the Debtor and the Committee aware of the *Sissom* opinion.  The parties were encouraged by the Court to structure the presentation of their cases in chief and their closing arguments to parallel the analysis of § 522(o) in *Sissom*.  Accordingly, the Court adopts the discussion of § 522(o) found in *Sissom* and applies it to the case at bar.

### B.  Findings of Fact

The facts relevant to the Committee's Objection under § 522(o) are as follows:

1. In January 2005, the Debtor paid attorney David Ziegler (Ziegler) a $35,000.00 retainer. Ziegler represented the Debtor in filing his Chapter 7 petition.

2. On December 5, 2005, the Judgment in the avoidance action was entered against the Debtor in the amount of $2 million.  [Comm. Ex. 3-C.1 and 3-C.3]  From this time up until shortly before the Debtor filed bankruptcy, the Committee and the Debtor were engaged in settlement negotiations.

---

[10] As previously discussed in footnote 5, the Court dismissed another theory of the Committee under § 522(o) at the end of its case in chief upon the Debtor's oral motion for judgment on partial findings pursuant to Fed. R. Civ. P. 52(c).  Under this theory, the Committee alleged that the $2 million bonus payment was nonexempt property and that construction of the previous homestead was an attempt to convert these nonexempt funds into an exempt homestead. The Court ruled, on the record, that the Committee had not presented sufficient evidence of fraudulent intent to support this objection.

3.      On May 18, 2006, the Debtor sold his previous homestead, located at 5410 Morning Breeze,

Houston, TX 77041 (the Morning Breeze Property), for $1,390,664.21. [Comm. Ex. 64.]

After payment of liens on this property, the Debtor received $675,222.06.  [*Id.*]

4.      Also on May 18, 2006, the Debtor purchased his current homestead, located at 11939 Royal

Rose Drive, Houston, TX 77082 (the Royal Rose Property), for $521,800.00.  The Debtor

paid the entire $521,800.00 purchase price out of the proceeds from the sale of the Morning

Breeze Property.

5.      On June 21, 2006, Ziegler and the Debtor had a telephone conversation about the possibility

of the Debtor filing bankruptcy in the near future.  Ziegler created three pages of handwritten

notes during this conversation (the Ziegler Notes).  [Comm. Ex. 3-A.11, pp. 29-31.][11]

6.      The Ziegler Notes read, in pertinent part, as follows:

"8,000 - Shutter
22,000 - Closets/Built Ins
15,000 - wood floors, paint, HVAC
90,000 - pool (30k prepaid)
25,000 - furn. / TVs
. . .
(20k left) -
        Summer camps, seaworld
. . .
Paper Trail
. . .
Prior to filing - accept 20k or file.
. . .
Have pool paid & completed before filing"

[Comm. Ex. 3-A.11, pp.29-30.]

---

[11] The Ziegler Notes were the subject of the Committee's Motion in Limine. [Docket Nos. 156 and 157.] The Debtor objected to admission of the Ziegler Notes on the basis of the attorney-client privilege.  The Court admitted the Ziegler Notes upon finding that the privilege had been waived because the Debtor had disclosed the Notes to the Committee during discovery and had not shown that procedures were in place to prevent disclosure, or that any attempt was made to seek return of the documents after their disclosure was uncovered.  *Alldread v. City of Grenada*, 988 F.2d 1425, 1433 (5th Cir. 1993); *see also Myers v. City of Highland Village*, 212 F.R.D. 324, 327 (E.D. Tex. 2003).

7.  On July 7, 2006, the Debtor made a final offer of $20,000.00 to settle the Committee's $2 million judgment.

8.  In July 2006, the Debtor spent more than $2,000.00 on a trip to SeaWorld with his children, which included $1,550.00 for three nights in a resort hotel.

9.  On July 31, 2006, the Debtor filed his Chapter 7 petition. [Docket No. 1.]

10. The Debtor's Schedule A, filed with his petition on July 31, 2006, states that the value of the Royal Rose Property is $550,000.00. [Docket No. 1.]

11. The Debtor testified that he believed the current market value of his house was $521,800.00, which was the purchase price and also the 2006 tax appraisal by the Harris County Appraisal District.

12. The Debtor spent no less than $119,102.08 on the following improvements to the Royal Rose Property:

| Date[12] | Vendor | Service | Cost | Citation |
| --- | --- | --- | --- | --- |
| 5/19 | Traditional Design | Hardwood Floors | $5,451.08 | Comm. Ex. 3-A.11, p. 11 |
| 5/25 | Houston Shutters | Shutters | $7,116.00 | Comm. Ex. 3-A.11, p. 10 |
| 5/27 | Molina Construction | Paint/Labor | $12,000.00 | Comm. Ex. 3-A.11, p. 12 |
| 5/30 | Space Man | Cabinets | $12,860.00 | Comm. Ex. 3-A.11, p. 13 |
| 6/17 | Space Man | Cabinets | $9,475.00 | Comm. Ex. 3-A.11, p. 14 |
| 6/1-15 | Mike Lykke | Pool | $25,000.00 | Comm. Ex. 12; Docket No. 76 |
| 6/20 | Mike Lykke | Pool | $30,000.00 | Comm. Ex. 12; Docket No. 76 |
| Jul. | Mike Lykke | Pool | $10,000.00 | Comm. Ex. 12; Docket No. 76 |
| Aug. | Mike Lykke | Pool | $7,200.00 | Comm. Ex. 12; Docket No. 76 |
| | | Total: | $119,102.08 | |

13. The Debtor testified that all these improvements were paid for with funds remaining from the sale of the Morning Breeze Property.

---

[12] All dates represent the year 2006. Where only the month is shown, there is no evidence regarding the specific date.

14.     The Debtor's original Statement of Financial Affairs did not disclose any of the payments made for the improvements to the Royal Rose Property. [Docket No. 1.] The Debtor testified that his failure to disclose these payments was based on the advice of his counsel that they were transfers in the ordinary course of business.

15.     The Debtor's amended Statement of Financial Affairs of December 7, 2006 [Docket No. 59] includes the payments for the improvements, but this amendment occurred after the Committee had already informed the Debtor of his failure to disclose. [Comm. Ex. 3-A.10.]

### C.    Conclusions of Law

Section 522(o), in pertinent part, states that:

[T]he value of an interest in—

> (1) real or personal property that the debtor or a dependent of the debtor claims as a residence; [or]
>   . . .
> (4) real or personal property that the debtor or a dependent of the debtor claims as a homestead
>   . . .
> shall be reduced to the extent that such value is attributable to any portion of any property that the debtor disposed of in the 10-year period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a creditor and that the debtor could not exempt, or that portion that the debtor could not exempt, under subsection (b), if on such date the debtor had held the property so disposed of.

There are four elements to establishing an objection under § 522(o): (1) the debtor disposed of property within the 10 years preceding the bankruptcy filing; (2) the property that the debtor disposed of was nonexempt; (3) some of the proceeds from the sale of the nonexempt property were used to buy a new homestead, improve an existing homestead, or reduce the debt associated with an existing homestead; and (4) the debtor disposed of the nonexempt property with the intent to hinder, delay or defraud a creditor. *Sissom*, 366 B.R. at 688.

1. **The Debtor made the improvements to the Royal Rose Property within 10 years of filing his bankruptcy petition.**

The Debtor purchased the Royal Rose Property on May 18, 2006. All of the improvements to this property occurred between that date and the time that the Debtor filed his Chapter 7 petition on July 31, 2006. Thus, the first element is satisfied.

2. **The Debtor made the improvements to the Royal Rose Property with the proceeds remaining from the sale of the Morning Breeze Property, and those proceeds were nonexempt.**

On May 18, 2006, the Debtor sold his prior homestead, receiving $675,222.06 in cash, and immediately purchased his current homestead for $521,800.00. This transaction left the Debtor with $153,422.06 in cash proceeds. Under Texas law, all of the equity that was transferred from the prior homestead into the current homestead maintained its exempt status. Texas law provides a six-month window during which proceeds from the sale of a homestead continue to be exempt despite not being invested in any homestead. TEX. PROP. CODE ANN. § 41.001(c) (Vernon 2006). The policy behind the statute is to protect homestead equity so that it may be reinvested into another homestead. *In re Zibman*, 268 F.3d 298, 305 (5th Cir. 2001); *Hill v. Jones (In re Jones)*, 327 B.R. 297, 302 (Bankr. S.D. Tex. 2005). The Debtor argued that all of the improvements to the Royal Rose Property occurred within six months of its purchase, and the funds, therefore, never lost their exempt status.

The Debtor is incorrect because the six-month grace period is not absolute. "[I]f the debtor purchases a new homestead any remaining proceeds from the sale of the first homestead are instantly rendered non-exempt." *In re Davis*, 170 F.3d 475, 483 n. 10 (5th Cir. 1999); *see also In re England*, 975 F.2d 1168, 1174 (5th Cir. 1992) ("the acquisition of another homestead during that six month period instantly changes the prior homestead to *former* homestead and deactivates the proceeds exemption statute such that the proceeds of the former homestead are no longer exempt."). When

the Debtor purchased the Royal Rose Property, the $153,422.06 in proceeds remaining from the sale of the Morning Breeze Property were rendered nonexempt. Thus, the second element of § 522(o) is satisfied.

### 3.     The Committee established that the Debtor used nonexempt property to pay for the improvements to the Royal Rose Property.

In the case at bar, the Debtor does not dispute that the proceeds from the sale of the Morning Breeze Property were the sole source of funds used to build the pool and other improvements at the Royal Rose Property. Thus, the third elements is satisfied.

### 4.     The Debtor acted with intent to delay, hinder, or defraud by spending all of the Morning Breeze Property proceeds on improvements to the Royal Rose Property.

Under § 522(o), the intent to hinder, delay, or defraud is similar to the burden under §§ 727 and 548. *Sissom*, 366 B.R. at 692. The moving party may either present direct testimony of the wrongful intent, or indirectly show intent through the badges of fraud from the Texas Uniform Fraudulent Transfer Act. The Committee presented both direct and indirect evidence of the Debtor's fraudulent intent.

### a.     The Committee's direct evidence of fraud

The Committee's sole piece of direct evidence is the handwritten notes of David Ziegler, the Debtor's bankruptcy counsel. According to the Committee, the Ziegler Notes consecrate a plan between Ziegler and the Debtor to consume all of the proceeds from the sale of the Morning Breeze Property before filing bankruptcy in order to prevent the Committee from recovering on the Judgment. The Court disagrees.

The Ziegler Notes do not conclusively show a plan being hatched to dissipate the nonexempt funds because it appears that the many of the expenditures on the list had already occurred before

11

this conversation. Both Ziegler and the Debtor testified that this telephone conversation occurred on June 21, 2006. Only $17,200.00 of the improvements were paid for after this date and that amount was related to the pool, construction on which had started well before June 21, 2006. Thus, the Ziegler Notes, while raising suspicions about the Debtor's conduct, do not conclusively establish the formation of any wrongful intent on May 18, 2006, the date that the Debtor purchased the Royal Rose Property and the nonexempt funds were generated.

### b. The badges of fraud

The Committee also presented indirect evidence of the Debtor's intent through the badges of fraud. The Committee's theory is that the circumstances surrounding the May 18, 2006 sale of the Morning Breeze Property and the purchase of the Royal Rose Property support a finding that, as of that date, the Debtor developed the intent to deplete the sale proceeds in order to prevent the Committee from recovering on its judgment. Pursuant to the analysis in *Sissom*, the Court considers 13 potential badges of fraud:[13]

### i. The transfer or obligation was to an insider.

The transfers at issue are the payments for the improvements to the Royal Rose Property. Since the Debtor is the only person occupying the Royal Rose Property, the transfers were for his own benefit. Therefore, this badge of fraud is present.

### ii. The Debtor retained possession or control of the property after the transfer.

The Debtor is currently residing at the Royal Rose Property and enjoying the benefit of the improvements. Since the Royal Rose Property is still his homestead and sole residence, this badge of fraud is present.

---

[13] The first ten badges of fraud discussed in *Sissom* appear in the Texas Uniform Fraudulent Transfer Act. TEX. BUS. & COM. CODE ANN. § 24.005(b) (Vernon 2006).

12

### iii.    The transfer or obligation was concealed.

The Debtor's original Statement of Financial Affairs, filed along with his petition on July 31, 2006, did not disclose any of the payments made for the improvements to the Royal Rose Property. The Debtor testified that he disclosed these payments to his attorney, Mr. Ziegler, who advised him that the payments did not need to be listed in the Statement of Financial Affairs because they were transfers made in the ordinary course of business. Several months later, on December 7, 2006, after the Debtor had engaged his current co-counsel, Mr. Colvard, the Debtor filed an amended Statement of Financial Affairs that disclosed the transfers. The tardiness of this disclosure does not cure the Debtor's prior failure to disclose. During the intervening months, the Committee, through its own investigation and review of documents, had become aware of the improvements and informed the Debtor in writing of his failure to disclose. *See Superior Crewboats, Inc. v. Primary P & I Underwriters (In re Superior Crewboats Inc.)*, 374 F.3d 330, 336 (5th Cir. 2004) (quoting *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1288 (11th Cir. 2002)) ("Allowing [the debtor] to back-up, re-open the bankruptcy case, and amend his bankruptcy filings, only after his omission has been challenged by an adversary, suggests that a debtor should consider disclosing personal assets only if he is caught concealing them.") Thus, the Court finds this badge of fraud is present.

### iv.    Before the transfer was made or obligation incurred, the Debtor had been sued or threatened with suit.

The Committee filed suit against the Debtor to recover the bonus payment several years before the Debtor filed this Chapter 7 petition. This lawsuit had been reduced to a judgment on December 5, 2005, before the improvements were made. Thus, the Court finds that this badge of fraud is present.

### v. The transfer was of substantially all the Debtor's nonexempt assets

On the petition date, according to the Debtor's own schedules, the Debtor had $400.00 cash on hand and $1,318.00 in a checking account. [Docket No. 1, Schedule B.] The improvements to the Royal Rose Property cost at least $119,102.08—an amount vastly larger than the cash assets on the petition date.[14] Accordingly, this badge of fraud is present.

### vi. The Debtor absconded—i.e., avoided service of process and/or concealed himself.

No facts were presented to suggest that the Debtor absconded or concealed himself in any way. Therefore, this badge of fraud is not present.

### vii. The Debtor removed or concealed assets

The Debtor concealed the existence of a tax refund check.[15] This act serves as the basis of the Committee's Objection under § 522(q), discussed in considerable detail below. Therefore, this badge of fraud is present.

### viii. The value of the consideration received by the Debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

No facts were presented to suggest that the improvements made by the Debtor were for less than reasonably equivalent value. Therefore, this badge of fraud is not present.

---

[14] The Court is not taking the Debtor's exempt assets into consideration under this badge of fraud.

[15] Although the tax refund is a separate issue from the improvements to the Debtor's homestead, the Court believes that the concealment of *any* assets is relevant to this badge of fraud.

> ### ix.   The Debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

The nonexempt cash used to fund the improvements was the Debtor's only liquid asset. According to the Debtor, at the time he filed his petition, he had $400 cash on hand and $1,318.00 in a checking account. [Docket No. 1, Schedule B.] He had negative monthly income of $3,326.00. [Docket No. 1, Schedule J.] The Debtor's summary of schedules states that he had total assets of $571,018.00 and total liabilities of $2,505,905.00. [Docket No. 1, Summary of Schedules.] The Debtor became insolvent as of the entry of the $2 million Judgment on December 5, 2005. Therefore, all of the improvement made between May 18, 2006 and July 31, 2006 occurred at a time when the Debtor was insolvent. Accordingly, this badge of fraud is present.

> ### x.   The transfer occurred shortly before or shortly after a substantial debt was incurred.

As stated above, the Committee's Judgment against the Debtor was entered on December 5, 2005. The Debtor began the improvements approximately five months later. The Court believes that this five-month period is sufficiently short, especially in light of the size of the Judgment and the fact that the Debtor was insolvent at that time, to conclude that this badge of fraud is present.

> ### xi.   The transfer was done just prior to the filing of the Debtor's bankruptcy petition.[16]

The Debtor purchased the Royal Rose Property on May 18, 2006 and made all of the improvements shortly thereafter. The Debtor filed his Chapter 7 petition on July 31, 2006. Therefore, this badge of fraud is present.

---

[16] This badge of fraud does not appear in TUFTA. It originally appeared in *In re Lacounte*, 342 B.R. 809, 816 (Bankr. D. Mont. 2005). This Court is persuaded that it should include this particular badge of fraud in its analysis.

xii.    **The Debtor is unable to explain the disappearance of assets.**[17]

No facts were presented about the Debtor's inability to explain the disappearance of assets.

Therefore, this badge of fraud is not present.

xiii.   **The Debtor has engaged in a pattern of "sharp dealing" prior to bankruptcy.**[18]

In *Sissom*, this Court defined "sharp dealing" to mean "unethical action and trickery."

*Sissom*, 366 B.R. at 700, n. 34.  On July 7, 2006, the Debtor made a final settlement offer to the

Committee.  The Debtor offered $20,000.00 as settlement of the Committee's $2 million judgment.

In the two months prior to this offer, the Debtor spent no less than $119,102.08 on improvements

to his homestead.  Additionally, in July 2006 (i.e., approximately the same time as the settlement

offer), the Debtor spent over $2,000.00 on a trip to SeaWorld with his children, which included

spending $1,550.00 on hotels for three nights.  The Court finds that the Debtor's use of the

nonexempt funds prior to bankruptcy and his conduct while negotiating with the Committee

constitutes sharp dealing.

xiv.    **A sufficient number of badges of fraud are present to infer fraudulent intent.**

The Court finds that nine of the thirteen badges of fraud are present in the case at bar.  The

Court considers more than merely the numerical majority of badges.  In weighing each badge of

fraud, the Court is particularly troubled by the convenient timing and conspicuous nondisclosure of

---

[17] This badge of fraud does not appear in TUFTA.  It originally appeared in *Lacounte*, 342 B.R. at 815. This Court is persuaded that it should include this particular badge of fraud in its analysis.

[18] This badge of fraud does not appear in TUFTA.  It originally appeared in *In re Agnew*, 355 B.R. 276, 285 (Bankr. D. Kan. 2006). This Court is persuaded that it should include this particular badge of fraud in its analysis.

the Debtor's improvements to his homestead.  Accordingly, the Court finds that the Committee has

established the Debtor's fraudulent intent.

### 5.    Calculation of the Non-Exempt Portion of the Royal Rose Property Under § 522(o)

Simply because the Committee has established all of the elements under § 522(o) does not

mean that the relief to which it is entitled should be the full amount spent on the improvements to

the Royal Rose Property.  The scope of the statute is limited to the value in a debtor's homestead that

is "attributable" to nonexempt property that was fraudulently converted into equity in the homestead.

The Committee bears the burden of establishing a current market value in excess of the $521,800.00

purchase price in order to show by what amount the improvements made by the Debtor actually

increased the value of the Royal Rose Property.[19]

The Committee did not call any expert appraisers or real estate agents to testify, but instead

chose to rely exclusively upon the Debtor's original Schedule A, which listed the Royal Rose

Property as having a current value of $550,000.00.  [Docket No. 1, p. 4.]  The Debtor testified that

in his opinion, the current market value of the house is $521,800.00, which is both the purchase price

and the tax appraisal by the Harris County Appraisal District for the year 2007.  The Debtor argues

---

[19] The Committee argues that it is entitled to recover the entire value of any nonexempt property that was disposed of through improvements to the Royal Rose Property.  In support of this position, the Committee relies on *In re Keck*, 363 B.R. 193 (Bankr. D. Kan. 2007).  The debtor in *Keck* took out large cash advances on credit cards in order to make improvements to his homestead, including a new driveway and patio.  *Keck*, 363 B.R. at 209-11.  The court in *Keck* sustained the homestead objection in the entire amount spent on the improvements.  *Keck*, 363 B.R. at 211.  While *Keck* supports the Committee's interpretation, the Court does not find it persuasive because the court in *Keck* did not account for the statute's use of the word "attributable."

The Committee's reading is correct in circumstances, such as in *Sissom*, where nonexempt assets were used as a down payment or to pay down principal because these uses have a direct, equivalent increase in equity.  However, in the case at bar, the Debtor used nonexempt assets only on improvements to the Royal Rose Property.  Improvements, unlike payments of principal, do not result in a dollar-for-dollar increase in the value of a property.  In cases where property has increased in value over longer periods of time, the objecting party would also have to show that the increase did not occur from market appreciation.  However, in the case at bar, approximately 10 weeks passed between the purchase of the homestead and the petition date.  In this short window of time, the Court finds that the improvements are the only reasonable source of the increase in the value of the property.

that the Court should disregard the value he assigned the property in his Schedule A and instead follow the tax appraisal because it is more current and is a market-based, objective number.

In the Fifth Circuit, owners of property are competent and qualified to testify about the value of their property, both real and personal. *La Combe v. A-T-O, Inc.*, 679 F.2d 431, 433 (5th Cir. 1982). Additionally, the Court may consider both the sales price and the tax appraisal as evidence of present value. *In re Turnbow*, 121 B.R. 11, 13 (Bankr. S.D. Tex. 1990) ("If sold fairly, the purchase price is the best evidence of the fair market value of the property.") (citations omitted); *FDIC v. Ambika, Inv.*, 42 F.3d 641, 1994 WL 708818 (5th Cir. 1994) (unpublished opinion). The Debtor's own testimony, the sales price, and the most recent tax appraisal are all probative evidence that the actual current market value of the Royal Rose Property is $521,800.00.

However, the Court is not limited to this evidence. As this Court recently discussed in *Sissom*, schedules are executed under penalty of perjury and a debtor is estopped from denying their accuracy. *Sissom*, 366 B.R. at 697 (citing *Jacobson v. Ornsby* (*In re Jacobson*), 2006 U.S. Dist. LEXIS 70433 at *54 (W.D. Tex. September 26, 2006); *Larson v. Gross Bank, N.A.*, 204 B.R. 500, 501 (W.D. Tex. 1996)).

The purchase price of the Royal Rose Property is indicative of the market value at the time of the sale, which was $521,800.00. However, since that time the Debtor has added a pool and other improvements totaling $119,102.08. Such improvements, particularly the pool, may not have a dollar-for-dollar increase in the market value of the house, but it is improbable that such improvements did not increase the property's value to some extent. Likewise, the Court does not give much great weight to the 2007 tax appraisal, which was $3,200.00 less than the 2006 appraisal. *See The Cadle Co. v. Orsini*, No. 06-203, 2007 WL 1006919 at *8 (E.D. Tex. Mar. 30, 2007) ("[T]ax values may or may not reflect the current fair market value of a given property; at best they are some

indication of value and do not have high probative value.") (quoting *In re Deep River Warehouse, Inc.*, No.04-52749, 2005 WL 1287987, at *9 (Bankr. M.D.N.C. Mar. 14, 2005)).  The Court does not believe that  $119,102.08 of improvements could have reduced the value of the Royal Rose Property by $3,200.00.  Also, at the time of trial, it was clearly beneficial to the Debtor to have the Royal Rose Property valued as low as possible: every dollar over the sales price is another dollar for which the Debtor is potentially liable.

The Court gives greater weight to the Debtor's original Schedule A than his testimony at trial, and concludes that the present market value of the Royal Rose Property is $550,000.00.  Since this increase occurred in such a brief period of time, the Court concludes that this increase is "attributable" to the improvements made by the Debtor.  Accordingly, the Committee's § 522(o) Objection is limited to $28,200.00, which is the difference between the current market value and the purchase price.

## V.      The Committee's Objection Under 11 U.S.C. § 522(p)

### A.      Introduction

The Committee objects to the Debtor's homestead exemption under § 522(p)(1) insofar as the Debtor's current homestead, the Royal Rose Property, was acquired during the 1215-day period preceding the filing of his Chapter 7 petition.  Further, the Committee argues that the equity in the Royal Rose Property that the Debtor transferred from the Morning Breeze Property is not protected by the § 522(p)(2) exception because the Debtor acquired his ex-wife's community property interest in the Morning Breeze Property within the 1215-day period.  The Debtor responds that: (1) the divorce decree was not an acquisition within the meaning of § 522(p); (2) the community property interest of Evelyn Presto, the Debtor's ex-wife, is not an interest within the meaning of § 522(p); and

(3) sustaining the Committee's Objection would contravene the statute's intended purpose and unjustly punish the Debtor.

**B.      Findings of Fact**

The facts relevant to the Committee's Objection under § 522(p) are as follows:

1.      On August 24, 2001, the Debtor and Evelyn Presto (the Prestos) purchased the land upon which the Morning Breeze Property would be built. [Comm. Ex. 62.]  The home was custom-built during 2002 and the Prestos moved into the Morning Breeze Property sometime during January 2003.

2.      The Prestos held title to the Morning Breeze Property jointly, and it was community property under the laws of the State of Texas.[20]

3.      On December 8, 2003, the Prestos obtained a first mortgage on the Morning Breeze Property in the principal amount of $400,000.00. [Comm. Ex. 60.]

4.      On May 13, 2005, the Debtor and Evelyn Presto entered into an Agreed Final Decree of Divorce (the Divorce Decree).  [Comm. Ex. 3-A.5.]

5.      Pursuant to the terms of the Divorce Decree, the Debtor received the Morning Breeze Property as his sole and separate property, and also assumed the first mortgage on the property. [Comm. Ex. 3-A.5, p. 35.]  In exchange, Evelyn Presto received as her sole and separate property a home in Colorado (where she moved with the Presto children after the divorce) and a significant amount of personal property. [Comm. Ex. 3-A.5, pp. 31-35.]

6.      On February 16, 2006, the Debtor refinanced the original mortgage on the Morning Breeze Property.   This refinanced mortgage had a new principal amount of

---

[20] *See* Tex. Fam. Code Ann. § 3.002 (Vernon 2006).

$650,000.00. Of this amount, $389,161.47 was used to pay off the original mortgage; $27,764.07 was used to pay a tax lien; $72,631.56 was used for closing costs; and the remaining $160,442.90 went to the Debtor as cash proceeds. [Comm. Ex. 63.]

7.     On May 18, 2006, the Debtor sold the Morning Breeze Property for $1,390,664.21. [Comm. Ex. 64.]  After paying off the $647,099.00 balance on the mortgage and $68,343.15 in closing costs, the Debtor received $675,222.06 in cash proceeds from the sale of the Morning Breeze Property.  [*Id.*]

8.     The sale price of the Morning Breeze Property included both the real property and the home furnishings.  The closing statement does not segregate amounts for the real and personal property, but the Debtor testified that the approximate value of the personal property was $100,000.00.[21]

9.     Also on May 18, 2006, the Debtor purchased the Royal Rose Property for $521,800.00. The Debtor paid the entire purchase price out of the net proceeds from the sale of the Morning Breeze Property.  No liens were placed on the Royal Rose Property.

10.    The Royal Rose Property is 3400 square feet in size and located in a gated development with a private country club.  Upon moving into the Royal Rose Property, Presto spent $7,000 to become a member of this club.  Presto is the only occupant of the Royal Rose Property except during the summer months when he has custody of his children.

11.    The Debtor filed his Chapter 7 petition on July 31, 2006. [Docket No. 1.]

---

[21] Although the Court finds that the Debtor's testimony has little credibility in many respects, it accepts the Debtor's estimate of the portion of the sales price that represented furnishings because there was no other evidence produced as to the furnishing's value.

C.      **Conclusions of Law**

1.      **Introduction**

11 U.S.C. § 522(p) states, in pertinent part:

> (1) Except as provided in paragraph (2) of this subsection and sections 544
> and 548, as a result of electing under subsection (b)(3)(A) to exempt property
> under State or local law, a debtor may not exempt any amount of interest that
> was acquired by the debtor during the 1215-day period preceding the date of
> the filing of the petition that exceeds in the aggregate $125,000 in value in–
>> . . .
>> (D) real or personal property that the debtor or dependent of the
>> debtor claims as a homestead.
>> . . .
> (2)(B) For purposes of paragraph (1), any amount of such interest does not
> include any interest transferred from a debtor's previous principal residence
> (which was acquired prior to the beginning of such 1215-day period) into the
> debtor's current principal residence, if the debtor's previous and current
> residences are located in the same State.

Section 522(p)(1) places a $125,000.00 limit on a debtor's homestead exemption as to "any

amount of interest" which the debtor "acquired" in his homestead during the 1215 days preceding

the date of the filing of the petition.[22]  The general limitation in § 522(p)(1) can only be understood

in conjunction with the exception found in § 522(p)(2), which allows a debtor to roll over equity

from one homestead to another if both residences are in the same state and the first homestead was

acquired prior to the 1215-day period.  Although numerous published opinions have discussed §

522(p), this Opinion is apparently the first to address the specific issue of whether a spouse's

community property interest in a homestead is a type of "interest" that can be "acquired" by a

---

[22] Unlike its counterparts in §§ 522(o) and (q), § 522(p) does not require a finding of misconduct or fraudulent intent by the debtor.  *In re Kaplan*, 331 B.R. 483, 485 (Bankr. S.D. Fla. 2005); *see also In re Rasmussen*, 349 B.R. 747, 752-53 (Bankr. M.D. Fla. 2006) ("It is clear that a debtor's intent to shield property from creditors is not a factor. In fact, in light of section 522(o), which deals with such intent, section 522(p) is not designed to deal with fraudulent conversions of property at all.").

division of property resulting from a divorce decree.[23]  For the reasons stated below, the Court holds

that any interest the Debtor acquired through the Divorce Decree is not protected by § 522(p)(2)(B).[24]

On July 31, 2006, the Debtor filed his Chapter 7 petition.  Thus, the 1215-day period set forth

in § 522(p)(1) began on April 2, 2003.  Prior to the 1215-day period, the Debtor owned no interest

in the Royal Rose Property.  On May 18, 2006, less than three months before filing bankruptcy, the

Debtor purchased the Royal Rose Property, which he now claims as his exempt homestead.  The

purchase of the Royal Rose Property is therefore an acquisition of an interest by the Debtor in his

homestead within the 1215-day period, and the Court concludes that § 522(p)(1) applies to the

Debtor's homestead exemption.  Since the Debtor acquired his current homestead within the 1215-

day period, the general rule of § 522(p)(1) limits his homestead exemption to $125,000.00 unless

he is able to show that some amount of equity in his homestead falls under the § 522(p)(2)(B)

exception.

The Court's analysis of § 522(p)(2)(B) addresses two issues: first, whether Evelyn Presto's

community property interest in the Morning Breeze Property qualifies as "any amount of interest;"

and second, whether the transaction resulting from the Divorce Decree satisfies the requirement that

such interest be "acquired by the debtor."

---

[23] Previous cases discussing § 522(p) have dealt with issues such as: (1) whether equity derived from appreciation is subject to § 522(p); *see, e.g., In re Rasmussen*, 349 B.R. 747 (Bankr. M.D. Fla. 2006); *In re Blair*, 334 B.R. 374 (Bankr. N.D. Tex. 2005); *In re Sainlar*, 344 B.R. 669 (Bankr. M.D. Fla. 2006); (2) whether the language "as a result of electing under subsection (b)(3)(A) to exempt property under State or local law" makes § 522(p) inapplicable in so-called opt-out states where the debtor does not have the ability to choose the federal exemptions; *see, e.g., In re Wayryen*, 332 B.R. 479 (Bankr. S.D. Fla. 2005); *In re Kaplan*, 331 B.R. 483 (Bankr. S.D. Fla. 2005); *In re McNabb*, 326 B.R. 785 (Bankr. D. Ari. 2005); *In re Kane*, 336 B.R. 477 (Bankr. D. Nev. 2006); or (3) whether the classification of property as a homestead is within the scope of § 522(p); *see, e.g., In re Rogers*, 354 B.R. 792 (N.D. Tex. 2006); *In re Greene*, 346 B.R. 835 (Bankr. D. Nev. 2006).

[24] Any interest acquired by the Debtor through the Divorce Decree can only be subject to the exception in § 522(p)(2)(B).  The main rule in § 522(p)(1) only limits the value of the exemption in the Debtor's current homestead, the Royal Rose Property.  Although the Debtor acquired an interest in his previous homestead, the Morning Breeze Property, through the Divorce Decree, he is not attempting to exempt any value in the Morning Breeze Property because he no longer owns that residence.

2. **Evelyn Presto's community property interest in the Morning Breeze Property constitutes an "interest" under § 522(p) because it had a distinct monetary value.**

First, the Court must determine whether Evelyn Presto's community property interest in the Morning Breeze Property is the type of interest referred to in § 522(p) as "any amount of interest." The Court's analysis relies upon existing case law on the issue of whether the homestead designation of previously owned property is sufficient to be "any amount of interest." *In re Rogers*, 354 B.R. 792 (N.D. Tex. 2006); *In re Greene*, 346 B.R. 835 (Bankr. D. Nev. 2006).

In *Rogers,* the debtor inherited her current homestead over a decade before filing bankruptcy, but first moved onto that property during the 1215-day period set forth in § 522(p). *Rogers*, 354 B.R. at 794. Thus, the first time that the property qualified as the debtor's homestead under Texas law was within the 1215-day period.[25] In concluding that a mere homestead designation is not an "interest" under § 522(p), the court stated that "the plain meaning of the statute indicates that 'interest' refers to some legal or equitable interest that can be quantified by a monetary figure." *Id.* at 796. *Rogers* held that although a homestead is a legal property right in Texas, it could not be an "interest" under § 522(p) because it is impossible to assign a monetary value to such a right. *Id.* at 797 ("To read the statute as the appellant suggests would create nonsensical interpretations. For instance, how would it be possible to have a 'quantity' of prophylactic protection from liens (the legal effect of homestead designation in Texas)? Or for that matter, how would it be possible to have a 'quantity' of classification as homestead?"). The court reached this conclusion by emphasizing the words "amount of," which precede "interest." *Id.* at 796 ("For the interest not to exceed

---

[25] The debtor in *Rogers* had held title to her current homestead for over ten years, but during that time lived at a different property which she claimed as her homestead. Within the 1215-day period, the debtor moved between properties and changed her homestead designation.

24

$125,000, it inherently must be an interest capable of being reduced to a quantitative, monetary measure.").[26]

The Court adopts the *Rogers* interpretation of "interest," which requires that the interest be capable of being "quantified by a monetary figure." Here, the interest that was acquired by the Debtor from Evelyn Presto as a result of their divorce had a definite, ascertainable monetary value and, therefore, was unlike a mere homestead designation. Prior to the divorce, the Debtor shared a community property interest in the Morning Breeze Property with Evelyn Presto. As a result of the Divorce Decree, the Morning Breeze Property became the Debtor's sole and separate property. He went from owning a half interest in the undivided whole to owning the entire property in fee simple. Therefore, the monetary value of Evelyn Presto's community property interest is equal to half of the total value of the Morning Breeze Property on the date of divorce.

Counsel for the Debtor argued that the Debtor gave Evelyn Presto other valuable assets in the Divorce Decree, including a second home in Colorado, in exchange for the Morning Breeze Property, and that this exchange somehow mitigated any interest that the Debtor acquired. The Court disagrees; indeed, this exchange supports the Court's conclusion. The Divorce Decree resulted in a transaction whereby the Debtor conveyed his rights to non-exempt property in exchange for greater rights in an exempt homestead. The underlying transaction was an increase in the monetary value of the Debtor's interest in the Morning Breeze Property. Therefore, the Court finds that the community property interest acquired by the Debtor in the Divorce Decree had a monetary value, and is subject to § 522(p).

---

[26] One bankruptcy court used this same argument—that the term "amount" implied a monetary value—in assessing whether appreciation is a type of "interest" within the context of § 522(p). *Rasmussen*, 349 B.R. at 756 ("This interpretation also makes sense in light of the term "interest" being used in conjunction with "amount." Amount is a quantitative term. A homeowner may be thought of as having an amount of equity in a home. It would be unusual to refer to a homeowner having an amount of fee simple ownership in a home.").

Not every bankruptcy court has followed the monetary value definition in *Rogers*. For example, the court in *Greene* rejected the monetary value definition of "interest." That court held that a homestead designation is an interest under § 522(p) because "the literal and plain reading of 'interest acquired'" includes a previously purchased property which only became a protected homestead within the 1215-day period. *In re Greene*, 346 B.R. at 842. The Court believes this holding is flawed because it does not give any consideration to the entire context of the phrase "any *amount* of interest that was acquired."[27] However, even if "interest" refers to a legal interest instead of a monetary interest, the Court's conclusion would not change. As a result of the Divorce Decree, Evelyn Presto executed a Special Warranty Deed with Assumption which granted the Debtor all of her rights in the Morning Breeze Property. [Comm. Ex. No. 3-A.6.] This act resulted in the legal title to the Morning Breeze Property changing after the divorce. Thus, under either interpretation of "interest"—monetary value or legal title—Evelyn Presto's community property interest qualifies as an "interest" under § 522(p).

> **3.   The Debtor actively participated in the negotiation of the Divorce Decree. Thus, for purposes of § 522(p), Evelyn Presto's community property interest in the Morning Breeze Property was "acquired by the debtor."**

The Court must next determine whether the transaction resulting from the Divorce Decree was an acquisition within the context of § 522(p). The Court believes that the phrase "acquired by the debtor" is sufficiently clear and unambiguous that it should be given its plain meaning. "The plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters."

---

[27] Likewise, *Sainlar* did not address the words "amount of" in concluding that "interest" in § 522(p) referred only to title to real property. *Sainlar*, 344 B.R. at 673.

*U.S. v. Ron Pair Enter., Inc.*, 489 U.S. 235, 242 (1989).  One bankruptcy court has noted, in discussing the use of "acquired" in § 522(p), that "[t]he word acquired is not a term of art in the law of property but one in common use. The plain import of the word is 'obtained as one's own.'  Black's Law Dictionary defines 'acquire' to mean: '[t]o gain possession or control of; to get or obtain.'" *Sainlar*, 344 B.R. at 672-673 (quoting *Helvering v. San Joaquin Fruit & Investment Co.*, 297 U.S. 496 (1936)).

In the same way that the meaning of "interest" is limited by the phrase "any amount of," courts have noted that the term "acquired" does not stand alone in § 522(p) and must be read in conjunction with the phrase "by the debtor."  In considering the meaning of "acquired," bankruptcy courts have distinguished between active and passive acquisitions. "[T]he addition of the clause 'by the debtor' after 'acquires' implies more than a passive acquisition—such as by appreciation; it implies an active acquisition of equity such as by an affirmative act of a down payment or mortgage pay down." *Rasmussen*, 349 B.R. at 757.  The acceptance of a gift has also been held to be an active acquisition.  *In re Leung,* 356 B.R. 317, 322 (Bankr. D. Mass. 2006) ("To the extent that 'acquired by the debtor' requires an affirmative action, I find that the Debtor acquired an interest because he accepted delivery of the deed and then made the affirmative step to declare a homestead.").

The Court finds that the Debtor actively acquired Evelyn Presto's community property interest in the Morning Breeze Property through the Divorce Decree.  The divorce itself is not the action to be judged as either active or passive: a divorce, standing alone, does not create an acquisition.  Rather, it is the Divorce Decree that this Court finds to have been an active acquisition. Both spouses were represented by counsel throughout the divorce negotiations, which resulted in an agreed division of their community property.  All of the decisions made by the Debtor during this process, culminating with his signature of the Divorce Decree, cannot be characterized as a passive

27

acquisition akin to appreciation. If the acceptance of a gift qualifies as an active acquisition, then a highly contested property division with two represented ex-spouses must be as well.[28]

Since the Divorce Decree occurred within the 1215-day period, any interest that the Debtor acquired pursuant to the Divorce Decree does not receive the safe harbor protection of § 522(p)(2)(B). However, the Debtor first acquired his community property half of the Morning Breeze Property prior to the beginning of the 1215-day period, which means that his own community property interest in the Morning Breeze Property is exempt under the § 522(p)(2)(B) exception.[29]

### 4. The Debtor's defenses

Counsel for the Debtor argued that adopting the position set forth above—that § 522(p) applies to property divisions resulting from divorce—would both contradict the legislative intent of § 522(p) and result in a grossly inequitable policy that punishes debtors for having divorced within 1215 days prior to filing bankruptcy. The Court believes that it is not necessary to consider the legislative history of this statute because § 522(p) has a plain meaning, but, even if such a review is mandated, nothing in the Court's holding is irreconcilable with Congress' goals in enacting § 522(p). Moreover, the Court's interpretation of § 522(p) does not unjustly punish all debtors who divorce shortly before filing bankruptcy; it merely limits a debtor's homestead exemption when a prepetition divorce has increased the value in the debtor's homestead.

---

[28] An alternative interpretation of the phrase "acquired by the debtor" emphasizes the role of legal title instead of the active/passive analysis. *Blair*, 334 B.R. at 376 ("However, one does not actually 'acquire' equity in a home. One acquires title to a home."); *Sainlar*, 344 B.R. at 673 ("Title to real property is acquired, equity is not."). Even under this title-based theory, the Court's conclusion would be the same. Evelyn Presto executed a Special Warranty Deed with Assumption which granted the Debtor all of her rights in the Morning Breeze Property and, in exchange, the Debtor assumed the mortgage on the home. [Comm. Ex. No. 3-A.6.] Thus, even under this title-based theory, the Divorce Decree was still an acquisition insofar as it resulted in the Debtor acquiring full fee simple title to the Morning Breeze Property.

[29] The different treatment of the Debtor's community property interest and Evelyn Presto's community property interest under § 522(p)(2)(B) is discussed *infra* Sec. V.C.5.— Calculation of the Non-Exempt Portion of the Royal Rose Property Under § 522(p).

a. **The Court's holding does not contradict the Congressional intent behind § 522(p) because closing the mansion loophole was not the sole purpose in enacting the statute.**

The Court believes that the language of § 522(p) in dispute—"any amount of interest acquired by the debtor"—is neither ambiguous nor vague. "If the statute is unambiguous, the court is to interpret the statute in accordance with its plain meaning and without regards [sic] to any extraneous materials." *Rogers*, 354 B.R. at 796 (citing *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004)). The Court finds that the relevant language in § 522(p) is clear and can be given its plain meaning without reaching absurd results. *Ron Pair Enter.*, 489 U.S. at 242. However, even if the Court is incorrect and the statute is ambiguous, the Court will briefly discuss the legislative history of § 522(p) in order to address any possible ambiguity. *See Blair*, 334 B.R. at 377 (concluding that § 522(p) was "reasonably clear," but that the term interest was "sufficiently ambiguous to warrant inquiry into the legislative history.").

As many courts have discussed, and this Court is keenly aware, "Congress enacted Section 522(p) largely to close so-called 'mansion loopholes' that could enable wealthy debtors to evade creditors by filing bankruptcy after converting nonexempt assets into an expensive exempted homestead in one of the handful of states that have unlimited homestead exemptions." *In re Green*, 346 B.R. at 841 (citing *Kane*, 336 B.R. at 482); *see also Kaplan*, 331 B.R. at 488; *Blair*, 334 B.R. at 377-78. However, "[i]t really is not for this [c]ourt to speculate on Congress' purpose when the language is clear and unambiguous. Only if the statutory language is ambiguous or would lead to absurd results should a [c]ourt attempt to discern legislative intent." *McNabb*, 326 B.R. at 789 (citing *Union Bank v. Wolas*, 502 U.S. 151, 158 (1991)). "The fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning." *Union Bank*, 502 U.S. at 158. Moreover, a statute's "plain meaning

is rebutted only in limited circumstances when a contrary legislative intent is clearly expressed." *Kaplan*, 331 B.R. at 487 (citing *Ardestani v. I.N.S.*, 502 U.S. 129, 135-36 (1991)).

Congress' intent to close the mansion loophole does not preclude or contradict the Court's holding that applies § 522(p) to the acquisition of new value in a homestead through a divorce decree.  It is an unnecessarily narrow view of the legislative history to conclude that Congress intended § 522(p) to regulate *only* those debtors who moved to another state in order to take advantage of more generous homestead exemptions.  As other bankruptcy courts have noted, "the active acquisition of equity in an exempt homestead shortly before filing for bankruptcy was the focus of [§ 522(p)]." *Rasmussen,* 349 B.R. at 758.  Under this less constrained view of § 522(p), the Court's interpretation actually furthers the legislative intent by stopping potential homestead exemption planning through divorce.

Thus, even if § 522(p) is deemed ambiguous and the legislative history is relevant, applying § 522(p) to a divorce decree does not contradict the statute's general intent of limiting the abuse of generous state homestead exemptions.  If Congress' sole purpose in enacting § 522(p) was to close the mansion loophole, it could have deleted the exception in § 522(p)(2)(B) and instead made the homestead limit in § 522(p)(1) only apply to debtors that moved from one state to another.

> **b.**    **The Court's holding does not unjustly punish the Debtor solely for having been divorced within 1215 days of filing his petition. Rather, the holding is directed at a specific disposition of property contained in the Divorce Decree.**

Counsel for the Debtor also argued that, regardless of the language used in § 522(p), the Court should not interpret the statute in a way that includes acquisitions by divorce because it would be fundamentally unjust for the Code to penalize debtors for divorcing within 1215 days of filing

their petition. While this argument is closely related to the argument rejected above, it is sufficiently distinct to warrant consideration.

The Debtor's characterization of this Court's holding as a punishment of all divorced debtors is off the mark. The timing of the Debtor's divorce (i.e., within the 1215-day period) is not why § 522(p) applies. Rather, the Debtor's decision to structure the Divorce Decree in a way that would maximize his interest in his exempt homestead while decreasing his interest in other non-exempt assets is the reason that § 522(p) applies. Moreover, the holding in this Memorandum Opinion will not impact every divorced debtor, only those who divorced within 1215 days before filing bankruptcy *and* acquired their ex-spouse's community property interest in their homestead through the divorce decree. This Court's holding simply discourages the use of a divorce decree as a tool for homestead exemption planning, which seems squarely in line with the intent of both § 522(p) in particular and BAPCPA in general.

### 5. Calculation of the Non-Exempt Portion of the Royal Rose Property Under § 522(p)

The Court must next calculate the portion of the Royal Rose Property that is not exempt pursuant to § 522(p). This calculation is a two-step process: first, the Court must determine the total amount of interest in the Debtor's homestead that is subject to § 522(p)(1); and second, the Court must subtract from that amount any interest that qualifies as "rolled over" equity under § 522(p)(2)(B).

#### a. The amount of interest in the Debtor's homestead that is subject to § 522(p)(1) is $425,000.00.

The Court begins by assessing the maximum potential value in the Debtor's homestead that is subject to § 522(p)(1). The calculation of § 522(p)(1) begins with the amount of interest in the homestead "acquired by the debtor" within the 1215-day period, rather than the current market value

as is the case under § 522(o).  As discussed above, the majority of courts have held that § 522(p)

excludes appreciation because it is either not an interest or not acquired by the debtor.  *Blair,* 334

B.R. at 376; *Sainlar,* 344 B.R. at 673; *Rasmussen,* 349 B.R. at 757-58.  The analysis under § 522(p)

should not use the homestead's current market value because it includes post-acquisition

appreciation occurring within the 1215-day period.

However, in the case at bar, the difference between the purchase price ($521,800.00) and the

market value of the Royal Rose Property ($550,000.00) is not attributable to passive appreciation.

Instead, the current market value of the Royal Rose Property increased due to the substantial

improvements made by the Debtor immediately after purchasing the property.  In its § 522(o)

analysis, the Court described these improvements in detail, most notably a pool costing over

$72,000.00.  Building a custom pool was an affirmative act of the Debtor and, therefore, the

corresponding increase in value from $521,800.00 to $550,000.00 must be included under §

522(p)(1).  Thus, the amount of interest acquired by the Debtor in his current homestead under §

522(p)(1) is $550,000.00.

Since the Debtor has an absolute right under § 522(p)(1) to exempt the first $125,000.00

that he acquired in his homestead during the 1215-day period, the total amount of interest in the

Debtor's homestead subject to § 522(p)(1) is $425,000.00.

> **b.      Deducting the amount of interest that qualifies as "rolled over" equity under § 522(p)(2)(B) results in a final non-exempt portion of $105,000.00.**

The Court must subtract from $425,000.00 any amount that qualifies under § 522(p)(2)(B)

as equity "rolled over" from a previous homestead.[30]  The Debtor's position is that the entire

---

[30] A review of § 522(p)(2)(B) would be useful before proceeding:

"For purposes of paragraph (1), any amount of such interest does not include any interest transferred

32

$675,222.06 in proceeds that he received from the sale of the Morning Breeze Property falls under the exception in § 522(p)(2)(B) because the Morning Breeze Property was acquired prior to the 1215-day period and both residences are located in the state of Texas. Under the Debtor's theory, the entire $550,000.00 value of the Royal Rose Property would be exempt. The Court disagrees.

Although the Morning Breeze Property provided the Debtor with the funds to purchase the Royal Rose Property, the Debtor's interest in the Morning Breeze Property was acquired at two different times—a fact which makes all the difference. The Debtor acquired his community property half of the Morning Breeze Property before the 1215-day period, which means it can be rolled over under § 522(p)(2)(B); however, the Debtor acquired Evelyn Presto's community property interest within the 1215-day period, which means it is not protected under § 522(p)(2)(B). In other words, the § 522(p)(2)(B) exception protects only the half of the Morning Breeze Property that the Debtor owned before the divorce. Moreover, as explained further below, that half is only protected to the extent that it was actually used to purchase the Royal Rose Property.

> **i.      The value of Evelyn Presto's community property interest in the Morning Breeze Property on the date of the Divorce Decree was $450,419.26.**

To determine how much equity the Debtor could roll over pursuant to § 522(p)(2)(B), the Court must calculate the value of the Morning Breeze Property on May 13, 2005, the date of the entry of the Divorce Decree. Because the parties did not present any direct testimony or evidence as to the value of the Morning Breeze Property on this date, the Court must fashion a value from the circumstantial evidence available in the record.

---

from a debtor's previous principal residence (which was acquired prior to the beginning of such 1215-day period) into the debtor's current principal residence, if the debtor's previous and current residences are located in the same State."

The Morning Breeze Property was sold on May 18, 2006, approximately one year after the divorce, for $1,390,000.00. The Debtor testified that approximately $100,000.00 of that price represented home furnishings and other personal property sold together with the real property.[31] Since § 522(p) only applies to homestead exemptions, the Court must subtract the value of the furniture from the purchase price, leaving a value of $1,290,000.00 for the real property. When the Debtor refinanced his mortgage in February 2006, the principal amount left on the original mortgage was $389,161.47. Although the actual amount on May 13, 2005 (i.e., the divorce date) would differ slightly because of the nine-month time difference, the Court has no better evidence from which to estimate the amount of liens on the Morning Breeze Property on the date of the Divorce Decree. After subtracting the original mortgage, the approximate equity in the Morning Breeze Property at the time of the divorce was $900,838.53 (i.e., $1,290,000.00 - $389,161.47). This amount was comprised of two parts: one half was Evelyn Presto's community property interest, acquired by the Debtor in the Divorce Decree on May 13, 2006; and the other half was the Debtor's community property share, acquired prior to the 1215-day period. In other words, under § 522(p)(2)(B), the Debtor could *potentially* roll over $450,419.26 of equity from the Morning Breeze Property into the Royal Rose Property, but the other $450,419.26 was not protected by § 522(p)(2)(B) because it was acquired within the 1215-day period.[32]

---

[31] *See* footnote 21.

[32] The Court's calculation is:

| | |
|---|---|
| $1,390,000.00 | (sales price on May 18, 2006) |
| - $100,000.00 | (portion of sales price representing furniture) |
| - $389,161.47 | (estimated existing liens on May 13, 2005) |
| $900,838.53 | (equity on May 13, 2005) |
| ÷ 2 | |
| $450,419.26 | (value of each community property interest on May 13, 2005) |

34

ii.      **Reduction of equity due to the February 16, 2006 refinancing**

The $450,419.26 that the Debtor acquired before the 1215-day period is protected by §

522(p)(2)(B) only to the extent that it was actually used to purchase the Royal Rose Property on May

18, 2006.  On February 16, 2006, after the divorce but before the sale of the Morning Breeze

Property, the Debtor refinanced the original mortgage on the Morning Breeze Property.  The result

of this transaction increased the total amount of liens on the property by $260,838.53.[33]  The Court

must account for this intervening reduction in equity in determining how much of the $450,419.26

remained when the Debtor purchased the Royal Rose Property on May 18, 2006. This is not a

straightforward task because, at the time of refinancing, the Morning Breeze Property was the

Debtor's sole and separate property and did not have two separate halves, as under this Court's §

522(p)(2)(B) analysis.  There are two plausible ways to apply the $260,838.53.  It can either be

charged entirely against the non-exempt half (i.e., Evelyn Presto's half that was acquired in the

Divorce Decree) or it can be applied ratably against both the non-exempt half and the exempt half.[34]

For the reasons described below, the Court rejects the former approach and adopts the latter.

a.      **The Doctrine of Marshaling Assets Under Texas Law**

Under Texas law, the equitable doctrine of marshaling would support deducting the entire

refinanced amount from the non-exempt portion of the Morning Breeze Property.  The rule of

marshaling is most often invoked by a junior lienholder.  The typical fact pattern involves two

---

[33] This transaction was accompanied by several strange circumstances which still concern the Court.  First, $72,631.56 of the $260,838.53 was applied to closing costs, which means that closing costs were 36.8% of the new money lent to the Debtor ($72,631.56/$188,206.97) and 12.6% of the total refinanced amount ($72,631.56/ $577,368.44).  These closing costs strike the Court as unseemly.  Additionally, the $160,442.90 received by the Debtor came in the form of ten small checks rather than one single check.

[34] There is an obvious third option, charging the entire amount against the Debtor's exempt portion.  However, the Court can find no legal justification for such a deduction.

creditors and two encumbered parcels of land: one parcel on which both creditors have liens and a second parcel that is encumbered only by a lien held by the senior lienholder on the first property. The junior lienholder on the first property may force the senior lienholder to foreclose on the property that is encumbered by only one lien before turning to the doubly secured property. *Kerens Nat'l Bank v. Stockton*, 120 Tex. 546, 553, 40 S.W.2d 7 (1931); *Killingsworth v. Rembert Nat'l Bank*, 32 S.W.2d 645, 647 (1930).

The doctrine of marshaling may also be invoked by a debtor in defense of his homestead. There is a "well-established rule in this state, that all nonexempt property of the debtor, both real and personal, must be exhausted before the homestead can be sold; and that a debtor may lawfully insist that recourse shall last be had to the homestead property, and that the lienholder whose security affects the homestead with other land shall resort, first, to the other lands, even though by so doing the security of other creditors on the same land may be impaired or destroyed." *Burg v. Hitzfeld*, 89 S.W.2d 272, 276 (Tex. Civ. App.—San Antonio 1935, writ dism'd) *see also Kerens*, 120 Tex. at 554 (citing *Pridgen v. Warren*, 79 Tex. 588, 15 S.W. 559 (1891)).

Neither party raised the doctrine of marshaling. However, the Court believes that its analysis would be incomplete without taking this policy into consideration. In the case at bar, the doctrine of marshaling would require this Court to deduct the $260,838.53 from the refinanced loan entirely against the $450,419.26 portion that he acquired from Evelyn Presto because, under § 522(p), that portion is non-exempt and the portion he acquired prior to the 1215-day period is exempt.[35]

---

[35] If marshaling were applied in this manner, it would result in no amount being non-exempt under § 522(p) because the amount that would be rolled over under § 522(p)(2)—i.e., $450,419.26—would exceed the amount subject to § 522(p)(1), i.e., $425,000.00.

*i.*    **Under Texas law, the doctrine of marshaling would not necessarily apply to the case at bar.**

The Court does not believe that the factual circumstances of this case justify an application of the doctrine of marshaling because marshaling requires the existence of a non-exempt asset; at the time of the sale of the Morning Breeze Property on May 18, 2006, no such non-exempt property existed.[36]  Both at the time the Debtor refinanced the mortgage and at the time of the sale, the Morning Breeze Property was entirely exempt under state law since it was a single homestead solely and separately owned by the Debtor.  The lien placed on the property could not have made reference to any divided portion of the Morning Breeze Property because such a division would not need to be imposed under state law.  Any non-exempt portion came into existence only upon the Debtor's filing for bankruptcy protection under federal law as a result of the operation of § 522(p).[37]  The state policy of first using all non-exempt assets is inapplicable because no non-exempt real property existed under Texas law at the time of refinancing. Moreover, the correct time to apply marshaling would be when the Debtor sold the Morning Breeze Property and satisfied the lien, rather than on the date of the petition.  Therefore, the doctrine of marshaling does not apply to the case at bar because under Texas law, there was no non-exempt portion to deduct the lien against.  Because marshaling does not apply, the Court finds that the most equitable division would be to reduce the pre- and post-divorce halves by the same amount.

---

[36] Marshaling is also applicable in the case of a bifurcated asset that has both exempt and non-exempt portions, such as a tract of land that exceeds the allowed acreage of a homestead in Texas.

[37] Indeed, if the Debtor had never filed bankruptcy, there would be nothing under state law that could limit his homestead exemption in a similar fashion as § 522(p).

> ii.     **Congress intended to supersede the policy of Texas' homestead law by enacting 11 U.S.C. § 522(p).**

The Debtor's election of state law exemptions does not necessarily mean that state law would determine how to apply the funds.  The Supreme Court has stated, "Property interests are created and defined by state law.  Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."  *Butner v. United States*, 440 U.S. 48, 55 (1979) (quoting *Lewis v. Mfrs. Nat'l Bank*, 364 U.S. 603, 609 (1961)).  The Fifth Circuit "has interpreted *Butner* to extend deference to state law whenever Congress has the authority to regulate an area under its bankruptcy powers but has chosen not to do so."  *Anderson v. Conine* (*In re Robertson*), 203 F.3d 855, 859 (5th Cir. 2000) (citing *In re Hudson Shipbuilders, Inc.*, 794 F.2d 1051 (5th Cir. 1986)).  By enacting § 522(p), Congress has exercised its authority to regulate homestead exemptions in a way that directly conflicts with Texas law.

As discussed earlier, the clear intent of Congress in passing § 522(p) was to close the so-called "mansion loophole."  *Kane*, 336 B.R. at 482; *Kaplan*, 331 B.R. at 488; *Blair*, 334 B.R. at 377-78.  Although BAPCPA maintained the two-track system of exemptions, which allows states such as Texas to permit debtors to select either state or federal exemptions, the addition of §§ 522(o), (p), and (q) demonstrates Congress' intent to prevent states from having unlimited and unregulated homestead exemptions.[38]  This is particularly true of § 522(p), which imposes a strict limit on the exempt interest in homesteads acquired within 1215 days of filing regardless of the homestead laws

---

[38] *See Kane*, 336 B.R. at 482-85 (noting the comments of numerous members of Congress expressing their desire to limit homesteads specifically in Florida and Texas); *see also McNabb*, 326 B.R. at 789, n. 9.

of the debtor's state. In *Sissom*, this Court described the addition of § 522(o) as a "sea change with respect to protection of homesteads." *Sissom*, 366 B.R. at 714. The same could be said of § 522(p).

The doctrine of marshaling is an equitable doctrine which fosters the underlying policy behind Texas homestead laws—preventing forced sales of the homestead. It follows that if § 522(p) was designed by Congress to supersede Texas homestead law (by placing federal limits on state homestead exemptions allowed in bankruptcy) then any policies—such as marshaling—which fall under the rubric of state law homestead protections should also be superseded. When applying a federal statute that undermines a state law policy, it makes little sense to invoke an equitable doctrine to reinforce that same state law policy.

> ### *b.*   Reducing both the exempt and non-exempt portion equally results in a final non-exempt portion of $105,000.00 under § 522(p).

The Court believes that the correct approach is to apply the $260,838.53 (i.e., the total amount that the Debtor's home equity loan decreased the equity in the Morning Breeze Property) equally against both the non-exempt and exempt portions. The Debtor's exempt portion of $450,419.26 should be reduced by $130,419.26 (i.e., half of the $260,838.53), which leaves $320,000.00. This figure represents the total amount of equity that the Debtor rolled over from the Morning Breeze Property into the Royal Rose Property under § 522(p)(2)(B); and, therefore, this amount of equity retains its exempt status.

Returning to the larger equation, this $320,000.00 that was rolled over under the § 522(p)(2)(B) exception must be subtracted from $425,000.00, which is the total amount subject to the general principle in § 522(p)(1).[39] The final result of the computation under §§ 522(p)(1) and

---

[39] The Court does not believe that there is any reason to give the Debtor a credit for the closing costs that would be incurred in the sale of his homestead. It appears that only one court has ever done so. *In re Summers*, 344 B.R. 108, 113 (Bankr. D. Ari. 2006) (subtracting 6% selling costs from the total value of the house in the same manner as the court

(p)(2)(B) is that $105,000.00 of the Royal Rose Property is non-exempt.  It may be helpful to have this final calculation expressed in the form of a mathematical equation:

|  |  |
|---|---|
| $550,000.00 | (interest acquired in Royal Rose Property during 1215-day period) |
| - $125,000.00 | (statutory limit provided by § 522(p)(1)) |
| - $320,000.00 | (equity rolled over from Morning Breeze Property under § 522(p)(2)(B)) |
| $105,000.00 | (total non-exempt portion under § 522(p)) |

## VI.    The Committee's Objection Under 11 U.S.C. § 522(q)

### A.    Introduction

The Committee's Objection under § 522(q)(1)(B)(ii) is based on the Debtor's receipt of a post-divorce tax refund check.[40]  Under the terms of the Divorce Decree, Evelyn Presto was entitled to half of these proceeds because the refund was for a year during which the parties were married. The Committee asserts that the receipt of these funds created a fiduciary obligation towards Evelyn Presto pursuant to the language of the Divorce Decree, and, further, that the Debtor breached this fiduciary duty by intentionally concealing the existence of the tax refund from Evelyn Presto.

The Debtor responds that: (1) he did not act with fraudulent intent because he timely wrote a check to Evelyn Presto for her half of the tax refund, and that the check was lost in the mail; (2) § 522(q) does not apply because the tax refund debt was fully satisfied post-petition; and (3) his

---

subtracted liens).  No reason was stated for crediting the debtor with these costs, and the Court finds no justification to do so in the instant case—especially in light of the suspiciously high costs incurred during the sale of the Morning Breeze Property. *See* fn. 33.

[40] The Committee's Objection contained an additional theory under § 522(q).  The Committee argued that the the Judgment [Comm. Exs. 3-C.1 and 3-C.3] was res judicata as to the issue of fraud and the existence of a fiduciary capacity.  The Court granted the Debtor's oral motion for judgment on partial findings pursuant to Fed. R. Civ. P. 52(c) as to this theory.  First, the Judgment made findings only as to hinder or delay under § 548, but made no findings of fraud. [Comm. Ex. 3-C.1, pp. 86-93.]  Section 522(q) requires actual fraud, and not merely an intent to hinder or delay. Second, the court in the avoidance action concluded that the debt owed by the Debtor to the Committee arose from the misconduct of Enron's board of directors in writing the bonus checks; the Debtor was merely liable as the recipient of a fraudulent transfer.  There was no finding in the Judgment that the Debtor had been a fraudulent actor himself.  In ruling against the Committee on the motion for partial judgment, the Court concluded that, as a matter of law, the language "the debtor owes a debt arising from" required that the debtor be the fraudulent actor and not merely a third party beneficiary/recipient of the actions of another entity.  It is not enough to establish that the debt arose from *a* fraud; it must have been from the *Debtor's* fraud.